Case number 19-1609 and 19-1610 National Wildlife Federation v. Secretary of the Department of Transportation et al. Argument not to exceed 15 minutes per side. Mr. Clark, you may proceed for the appellant. Please the court. I'm Jeff Clark from the Justice Department's Environment Division here today on behalf of the United States. I am splitting argument with Mr. Colburn. He will take three of the 15 minutes and I will take eight of the remaining 12 and then save four for rebuttal. Discretion is the life's blood and the oxygen for both the applicability of the ESA consultation obligation and of NEPA's procedural mandate to study environmental impacts. By contrast, mandatory duties are their death knell. Where an agency is constrained by a mandatory duty, any argument that the ESA consultation obligation attaches or that environmental impact statements or environmental assessments have to be performed collapses. Here, Clean Water Act section 311 J5E, that's 33 U.S.C. 1321, that's section 311, I'll be using the section numbers from here on out, provides, quote, that with respect to any plan submitted under this paragraph, the president shall, Romanet 3, approve any plan that meets the requirements of this paragraph. FINSA did not err here in contrast to what the district court held below in reading its delegation of presidential power to be a mandatory duty. And those requirements referred to in section 311 J5E are six highly reticulated criteria. And they're specified at 311 J5D Romanets 1 through 6. Under the Supreme Court's homebuilders decision, Mr. Clark, Mr. Clark, can I ask you a question? So you just said something describing the criteria like highly reticulated criteria. So does that matter? Or is your argument anytime there's sort of a, if you find this, then you must do that, the agency lacks discretion? Or does it matter what those criteria look like? So your honor, I think that we're arguing both things. So here we have, six highly reticulated criteria in homebuilders. There were nine criteria in Clean Water Act section 402B 1 through 9. And the Supreme Court held basically that you couldn't bolt on any additional requirements, namely that if you did attach the ESA consultation obligation to B1 through 9, you'd then have a 10th factor. So what about, I'm sorry to interrupt, but what about the provision that your friend on the other side points to? Because it says consistent with the requirements of the National Contingency Plan and Area Contingency Plans. Could that rope, as they argue, discretion in and thus make this discretionary rather than, I guess, judgment? So, Judge Kapar, the key cases that we rely on, the homebuilders case and the public citizen, the Mexican trucks case, they don't indicate that if there's discretion anywhere, that's sufficient to apply either NEPA or ESA, respectively. I want to return to showing you how there's a lot of discretion in 402, which is what the Supreme Court held, still wouldn't allow the ESA to attach. But let me respond first to your point about the reference to in J5 to Romanet 1 to the concept of consistency with the National Contingency Plan and the Area Contingency Plan. So if you look at 49 CFR 194.107B, that's the agency's reasonable interpretation of what consistency means. And if you look at those, they're actually quite mechanical requirements. So there are, it looks like Romanet wise, well, there's a one with three Romanets, and then there's a two with four Romanets. None of those things really talk about anything where you could get a foothold to apply discretion about doing ESA analysis or doing NEPA analysis. So we think that the agency's interpretation of the consistent term in Romanet 1 is something that, you know, they did in a reasonable fashion. They've been doing it for 22 years since the regulations were issued, and no one has ever made this sort of challenge before. It's really unprecedented. But to return to showing you how there was a lot of discretion in Clean Water Act section 402, let me just point out some provisions to you. 402B1, that was what it issued, the nine criteria there in the Clean Water Act. The first one, number 1A, refers to compliance with section 1311. And if you look at 1311B, you see there's a reference there to using the best practical control technology currently available as defined by the administrator. So the administrator clearly has discretion to define what the best available control technology is. And yet, despite that discretion, that being fed into the nine criteria wasn't sufficient to open the door to the ESA. Mr. Clark, I'm sorry, when you're referring to 402B1, you're talking about the statute it issued when homebuilders, correct? Okay, thank you. Can I distract you from that for a second, as long as we're talking about homebuilders? How do we define the line between judgment and discretion? Because homebuilders talks about specifically the distinction between judgment and discretion. Where is that line? Well, here, your honor, I think that it's something that, to be fair, you know, in answering your question, can only be defined with particular facts and circumstances. So in this instance, we're not talking about what I call a typical ESA case or a typical NEPA case where, you know, the agency is authorizing action that might harm creatures, harm the environment. We're talking about a protective plan. If there's an accident, the on-scene coordinator under the act is going to address that. He's going to decide what actions need to be taken in order to respond to the spill on the ground as an exigent circumstance. What we're talking about here is something that is mechanical. It is something that is basically driven by... So does, I'm sorry, does judgment mean mechanical? In other words, is judgment really, because I don't see it as a synonym for mechanical, but I'd be curious, is that what you're saying? If the agency mechanically applies it, then it's judgment, and if they don't, it's discretion? No, your honor, let me go back to a question I gave as an answer, an answer I gave as a question to Judge Larson, that discretion anywhere in the statute isn't sufficient to turn off, I'm sorry, is, you know, something that will not prevent home builders and will not prevent the Mexican trucks case from applying. So there is discretion in 402. There's judgment in that. In fact, if you look at 402b... Right, so that's a great argument, but let me move you back because I'm just trying to get an answer, and maybe you don't have it. Imagine writing the opinion. How do you draw a line between judgment and discretion? I understand your argument, why it's judgment in this case, but what I want to understand is, how do we draw the line? Does that make sense? I was starting to try to give you an answer about the fact that we're dealing with accidents. So in this kind of context, you're going to have, you know, let's just take the ACP, which you raised, right, and the NCP. Those things are fait accompli. They're on the shelf at that point. They're not being changed by what my opponents are trying to do in this case here. You look at whether, when the spill response plan is submitted, whether it is consistent with that, and the focus is on resources. Do you have enough personnel? Do you have enough skimmers? Are you going to use particular kinds of special measures like dispersants? So you want to have dispersants on hand, or would you want to be doing in-situ burning, in which case you may want to have the burning chemical again. Once those capacities are established, the requirements that have been interpreted in the regulations fleshing out what consistency means, they've all been met, and that is, you know, sorry to use the term again, just the bar, but those are mechanical. They don't require, you know, a sort of abundance of discretion to be applied. They really are something that the PHMSA agency is just looking at and deciding to apply what's in the plan against the requirements that are more like a checklist in its own regulation. So, Mr. Clark, oh, I'm sorry, Judge Merritt, go ahead. If I could ask you a question about 1321, the definition section, A, where remove or removal is defined and where it says, um, um, but not limited to fish, shellfish, and so on, why does not that provide extremely broad discretion? Well, Your Honor, the term remove as defined in A8 of the statute is one that feeds throughout the entirety of Section 311, which is a vast provision. The main focus on that provision is in providing the, uh, how this bill is actually going to get cleaned up. The response plans are one small element of that. So, the focus on the remove provision in the J5 provisions is to talk about being ready with the resources, as I was describing, the resources, the personnel, the necessary chemical, the necessary boom to remove. It's not testing generally whether everything that could be done under a removal action by Federal Unseen Coordinator who only steps in once there's an actual accident. That is extremely broad, uh, power, as you're suggesting, Judge, but it's not power that is relevant to J5 when we're talking about, uh, the, uh, spill response plan requirements. Judge Larson, you had a question? Yes, so this kind of follows on that. So, should we be thinking about this case as, as Judge Tappara suggested, as the line between judgment versus discretion, or when you're talking about resources, personnel, etc., is your argument, well, there's some discretion or judgment in there, but it's not related to the environment? In other words, there might be some discretion, there might be, or some judgment to be made here, but not about environmental or species concerns. Is that your argument? Yes, yes, so let me use the question about if a public citizen thinks it would be required for that. We were talking about safety regulations on trucks that would be coming from Mexico, and certainly there would be some discretion involved in doing that, right, but it wasn't the relevant form of discretion. You have to look at the relevant form of discretion. The relevant form of discretion for purposes of NEPA that the public of the trucks being coming into the country in the first place, that was not discretionary. That was set up as a mandatory duty, just as J5, because the president had decided to authorize the Mexican trucks under a free trade agreement to come into the U.S. Similarly, J5 is set up as a non-discretionary mandatory duty statute. For that reason, that's why Mexican truck supplies, and that's why what the NWF is trying to do here is legally incorrect. I think that I've reached the conclusion of my minutes, or maybe a bit beyond, so Judge LaFarge, you may have a question, but otherwise I may like to try to reserve it for a moment. No, I'll wait and ask your friend. Okay, thank you. Good morning, Your Honors. Good morning, Mr. Coburn. You may proceed. Thank you, Your Honor. I think the discretion versus judgment discussion that we just heard is interesting and useful, but I think the key, Judge Larson, I think you hit the nail on the head. The key is, is the agency called upon here to exercise the kind of discretion that would trigger the ESA or the kind of discretion that is relevant to NEPA? So here, there is no discretion on the ESA to consider steps to avoid heavily in a speech. This very specific criteria in the statute. Mr. Coburn, could it never be that one of the factors is discretionary? It says shall, like in the statute, so they shall approve if these six factors are met. Could it never be that if one of them is discretionary, it creates discretion even though it says shall? You could imagine such a so I can't speak. Give me that example. I would never say that it could never be. Yeah, sorry. No, I'm sorry. Give me that example if you can. What is that example, the circumstance? I haven't seen a case that raises that situation, but you could imagine a situation where an agency has broad discretion to grant a license and it can take public convenience and necessity into account, a not uncommon circumstance. Their agency is very broad discretionary. Can I ask to follow? Go ahead. So it's not the structure of the statute. The statute said you must consider A, B, and C, and A and B are highly reticulated, and C is the public convenience and necessity. If you find A, B, and that it meets the public convenience and necessity, then you shall. You would say, okay, you got to do it there. That would be a case where I think you could make a better argument. Make an argument. Certainly, that is not our case. That is not our case. None of these criteria give the agency a license to consider species savings, non-jeopardy, or alternatives under NEPA, or mitigation measures under NEPA. Those kinds of discretion are simply absent. Mr. Cohn, what is the language in Home Builders, I'm sorry to keep coming back to this case, but it seems like an important case. What is the language where Justice Alito says an end to itself or an end in itself? So it seemed to me he was saying that if, or go ahead, why don't I let you answer? No, I think that's exactly an important passage from that case, because what the court said is that the agency has no discretion to avoid jeopardy to species as an end in itself. In other words, no broad enough discretion to protect the species. It's simply not among the six criteria. In our case, it was not among the criteria in the Home Builders case, and that's why the ESA did not apply there. It does not apply here. Mr. Coburn, your time is up. Ms. Judge Merritt, do you have any questions for Mr. Coburn? No, I don't. Judge Larson? No, thank you. I'm good. Mr. Coburn, anything you want to wrap up with real quick, or are you good? Thank you, Your Honor. Yes, I'd like to make the point that these plans only apply until EPA and the Coast Guard, which are the primary agencies designed with the responsibility to address releases, until they get on the scene. Once they're on the scene, these plans do not apply. So again, not only is the discretion limited, but PHMSA has no role, once a release occurs, in consulting with Fish and Wildlife or addressing a species issue or other environmental issues. They have no role at the time of the of the consideration of whether a plan should be approved. Okay, thank you, Mr. Coburn. Thank you, Your Honor. Mr. Salim, am I pronouncing that correctly? You are, Your Honor. Okay, you may proceed. Thank you, Your Honors. Oday Salim for the National Wildlife Federation. The Oil Pollution Act provides PHMSA discretion to shape private oil spill response plans in ways that benefit listed species and the environment. The arguments to the contrary defy the text of the statute and common sense. When Congress wrote the Oil Pollution Act, it was writing a remedial law. It was responding to not only a terrible oil spill, but a terrible oil spill response, in the case of the Exxon Valdez spill. And one of the most important aspects of that law was that we get all of this figured out in advance, that we understand how we're going to, how we're going to avoid an oil spill to begin with, but how we're going to respond to an oil spill once it happens through many different layers of planning. The National Contingency Plan, the Area Contingency Plan, and the primary response plan, the very first one to be implemented, which is the private oil spill response plan. The other, the government agencies don't kick in until there's an issue or they have to swoop in to help with resources. It's the private plan that goes first. And so it's hard to imagine that when Congress wrote that remedial law. I'd like to ask you a question. Can you hear me? Yes, Your Honor. Could you tell me what your view of the role of the 3121A8 is in the, whether that creates discretion or not? Your Honor, you're referring to the definition of removal, is that right? Yeah. Yes. Thank you, Your Honor. So, you know, if you look at the section 311J5D criteria, the criteria that are at issue here, among the six criteria, one of them, one of the criteria specifically refers to removal. And so it says private personnel and equipment have to be maximum extent practicable, a worst case discharge, and to mitigate and prevent the substantial threat of such a discharge. So that would incorporate, by reference, this 8, right? That's correct, Your Honor. If you look at that, and even if you look at the regulations, clearly what Congress has in mind here is protection, not only by the way of species and the environment. I mean, we're also very concerned about private property and public of Congress's concerns. I think we all probably have seen images of the Exxon Valdez oil spill and the amount of destruction to wildlife that occurred. So this entire statutory scheme is about protecting wildlife, including listed species. Mr. Salim, how do you deal with your friend's argument in response to that? I think Mr. Clark made it, that in the factors in home there was some discretion, but that the shall, in essence, to simplify it, the shall made it mandatory or judgment or mechanical, the approval, and thus ultimately there's no discretion. And so they have to approve it. Yeah, thank you, Your Honor. You know, my reading of the Supreme Court opinion there is that they did not find any room for discretion in any of the nine criteria were mere triggering events. It's a very kind of objective mechanical, to use a word that was used earlier, analysis of whether the criteria are met. And what they were trying to do in home builders was, this is what the court says, is that they were trying to import a 10th criterion from the Endangered Species Act, which came later. And there were obviously concerns about repeal by implication, etc. So actually, in my reading of home builders, you really can't find any discretion or judgment in those nine criteria. They're all quite mechanical, and it's important. But don't they say, I'm sorry to interrupt you, you pointed, you used, and in your brief you did this too, you used the words judgment and discretion, it seemed to me, a little bit interchangeably, you just did, but didn't they draw a line between judgment and discretion? Your Honor, I don't think they did. But to the extent that they did, this is the way that I understand it to function. Discretion is really just, does the agency have the ability to shape the end product in a way that benefits the environment and species? Now, if the agency has no ability to shape that end product, then there's no exercise of discretion. In order to exercise that discretion, they have to use judgment to do so. So for me, judgment is a, almost like concentric circles, it's something that exists within discretion, discretion exists. Okay, I think I, so you wouldn't draw a line between judgment and discretion, and you don't think the court did in home build? I don't, I don't think they did, Your Honor. I think ultimately, when we say judgment, what we mean is sort of technical and environmental judgment necessary to know, first of all, whether the criteria have been met to begin with, you know, is there consistency with the contingency plan? Is there an adequate plan for removal and mitigation, you know, of the oil spill? That requires a lot of technical judgment. So for us, when we use the term judgment, I think what we're saying is technical and environmental and expert judgment that you need after the statute, after the law has, contains language that provides the agency discretion to shape the plan. In other words, discretion refers to whether the statute allows the agency to shape, to shape these plans, judgment is required in the actual shaping of them. So one final question, I'm sorry. So your argument is if there's discretion to Judge Larson's questions in the earlier segment, if there's discretion in any of the factors, no matter how attenuated from the ultimate decision that best discretion in the agency? Your Honor, so two things. One, I agree that if you have multiple factors or standards, some of them are mechanical and objective, one of them requires discretion, then that is enough. Now, by definition, that means that the scope of any NEPA or Endangered Species Act analysis will be limited to that particular factor. We're not saying that it opens up ESA and NEPA analysis to the entire statute or to all of the other factors, just to the factor that provides discretion. That's the first thing I would say. The second thing I would say is if you look at these factors in J5D, the criteria that we focus on, which are consistency with the contingency plan, and the two criteria that are about mitigating the harm from an ultimate discharge of oil, if you look at those factors, they couldn't be any more different than the factors in home come after the ESA and NEPA. There's no repeal by implication concern. Second of all, they are expressly about environmental protection. In public citizen, understandably, you look at those criteria and none of them were actually about protecting the environment. That might have been one of the results of an increase or decrease in traffic, but the criteria themselves didn't address the environment and judge the part. I think that speaks to your question earlier about a line from Judge Alito's opinion in Home Builders about something being an end in itself. These factors have species and environmental protections as ends in themselves. That's what these J5D criteria are all about. We're not trying to import species and environmental considerations from other places in the statute or other statutes entirely. So that's for me one of the big differences. Mr. Salim, may I ask you, so help me understand what would happen if the agencies are prepared an environmental impact statement? Then what would they do with it? I think that's one thing that has troubled me here. Thank you, Judge Larson. You know, we talk about this in our brief in the section on NEPA when we talk about the piping plover and the nest sites. This is also something that if you care to look at some point at the Natural Resources Defense Council amicus brief, this is, you know, laid out there as well. But basically, let me give you an example of what could happen. There are a lot of different ways to deal with oil in water. In some ways, you want to remove it from the surface as quickly as possible through perhaps burning. That would cause air pollution, but it would remove it from the surface quite quickly. You have some other responses that would allow oil to fall to the stream bed or what we call the benthic environment. And in that case, you may have harm to some of the benthic environment, but you avoid the damage of air pollution that would result from burning. Now, a lot of these, a lot of the technical and expert judgment that has to be exercised when making this decision would be supplied by a NEPA and an ESA analysis. For example, you would first of all have not only the agency itself, but the public commenting on whether burning or allowing it to fall into the stream bed would be a better idea. Depending on where you are in the water body, it could be that there are piping plover nests very close by to an area that they might want to burn. And they decide, you know what, this is not a good area in the water to burn the oil because it's going to cause pollution and it's going to make it into those nests. Let's let the oil fall to the bottom. We can live with that damage because it's not damaging an endangered species. But the question I still have is at the end of the day, the district court found that all the criteria were met, right? And so at the end of the day, if all the criteria are met, then the agency shall approve, right? So even if they had this information, I'm not sure what they would do with it. Your Honor. Oh, you just moved in my screen. Sorry, I lost you. Can you hear me now, Your Honor? I can hear you. Yeah. Okay. Your Honor, I want to, if I have the time, I'd like to do three responses to that. The first one is, you know, we made the argument that there was not enough information in the plan to meet the statutory standards and also that there was not enough information in the plan to meet the statutory standards. So the court found in our favor an explanation and the court said that we simply didn't supply enough information about what was lacking in the plan for the court to decide in our favor and to decide that there was something wrong with the content. So the court was never faced with specific arguments from us about what was wrong with the content of the plan. That's number one. Number two, you said, well, no matter what is there, they're still going to have to approve. But the point is that PHMSA can require amendments to plans. The statute says that expressly, that if the statutory factors are not met, they can require amendments. So for example, in the piping clover example I gave you, if PHMSA reviewed a plan and it looked at one of the criteria and it decided, this plan is not enough to mitigate the potential adverse effects of a particular kind of oil spill response, you're going to need to go back and amend it and take into consideration, for example, the piping clover nest. Well, right there, you see that PHMSA, by being able to require amendments by the statute, is able to shape the plan and ultimately approve it. I'm not sure I understand why that is discretion. In other words, it seems to me amending just allows you by its nature to meet the criteria. So you say you haven't met the criteria, I'm performing my mechanical function and you need to amend to meet the criteria. Why isn't it as simple as that and thus not vesting discretion in the agency? Your Honor, I'll use an example that was used earlier, the public convenience and necessity, and I'll ask the court to consider the portion of our brief where we talk about a D.C. Circuit case that involved the Federal Energy Regulatory Commission. And in that case, the court found that there was discretion. Now, if you look at the statute in that case, the statute requires the Federal Energy Regulatory Commission to approve a license if, among other factors, it's found that it's in the public convenience and necessity. In other words, to us, it is bootstrapping to say that if a statute says you, the agency, shall approve once the criteria are met, no discretion can be exercised. It seems odd to us that a statute would tell an agency, make sure that certain criteria are met, but even if you think that they're met, go ahead and add all kinds of other things on top of that that may or may not have anything to do with the criteria. So from our perspective, of course, the agency would have to is in that initial step, evaluating one, whether the criteria are met, and two, how to shape the plan or the license or the permit to make sure that the criteria are met. In other words, altering the proposed plan or license to make sure that those criteria are satisfied. For us, that's where discretion lies. It doesn't lie after you've determined that the criteria are met, and then you're going to add something on top of that. And I think if you look at homebuilders and public citizen, they're very clear about that. They would have been in homebuilders. I think they would have been happy to allow NEPA or ESA review had one of the criteria required that kind of discretion, but instead they found that you were having to import it, a 10th criterion from another statute. Mr. Sling, can I ask you an unrelated question, which is, well, so I think I agree with you that Chevron doesn't apply here, but what about Skidmore? The agency seems to have interpreted the mandate under the Clean Water Act narrowly since Congress added this section to the statute. And then obviously the NYSERDA dual applied Chevron, but I'm more curious, why shouldn't we give this longstanding position deference under Skidmore? Well, Your Honor, I mean, I think so. First of all, I think that your question reflects our position, which is certainly Chevron doesn't apply. Skidmore might apply, and the question is, do you give them deference? Your Honor, as I just see that my time is up, can I finish my answer to your question, Judge Lepore? Yes, absolutely. And then we'll check with the other judges. Thank you to see if they have questions. Sure thing. So for us, this doesn't deserve even Skidmore judgment for a couple of reasons. One, there's the one letter that they point to once in time where they state this position. And two, we just don't think it's persuasive, which is what Skidmore deference requires. There's just no persuasiveness when you have a statute which criteria are clear on their face that they're about the environment and allow the agency to alter the plan to improve the environment. Thank you, Mr. Salim. Judge Larson, do you have any other questions? No. Judge Merrick? No, I do not. Okay, thank you very much, Mr. Salim. Thank you, Your Honor. Mr. Clark, I think you're handling the rebuttal, correct? That's correct, Judge Lafar. Let me try to run through a sequence of points in the order in which they came up. You asked a question about whether you could have a statute that has discretion but says shall. And I think that the Restore case that's an apposite that we distinguished in our briefing is such a case. That's a case where the Forest Service was told that it shall accept a land exchange if it deemed it acceptable. But certainly, if you have an acceptability criteria, you're in the realm of full-throated discretion. And that's exactly one reason why the District Court heard because it invoked this case and it read Section 311J as if it did have an acceptable term built into it. And it doesn't. You'll search the statute in vain for that term. Second, Judge Lafar, you asked about the end-in-itself language in the Home Builders case. And I think there it's closely connected, obviously. It's on page 671 with the concept of not bolting on new criteria to look at as ends in themselves. And we think that this case compares directly to the nine factors there. Here we have six, but they're still highly reticulated and nothing in them admits of looking at Endangered Species Act or looking at NEPA compliance as ends in themselves for that matter. Third, Mr. Salim said that he thought that the whole point of these plans under the Act from a purposive standpoint was to get everything done, quote-unquote, in advance. I can tell you from having spent nearly a decade of my life working on the Deepwater Horizon oil spill that that's not what happens. You don't just pull a plan off the shelf and it tells you, follow step one, follow step two. Everything is actually done on the ground by looking at the plan. The point of the plan is not to tell you, it's not a plan in the sense of step A, B, C, D, E. It's a plan in the sense of making sure that you have the resources available to do the response actions that the federal government exclusively controls. You'll see that in Section 311C. The federal government exclusively controls all federal, state, private, local response actions. That's the purpose of the plan, to make sure you have the resources so that the federal on-scene coordinators judgments can be read. Fourth, Judge Merritt has come back several times to 311A8 defining removal, but that statute doesn't say what the district judge said below. It doesn't say something like, please maximize your ability in the plan to do better removal actions or do best possible removal actions. It doesn't say anything like that at all. Instead, it is far more mechanical. It says, identify and insure. This is J5D Romanette 3. Identify and insure by contract or other means approved by the president the availability of private personnel and equipment necessary to do the removal. So it's the focus again on the resources. It's not the focus on doing a broad removal action. That's just a misreading of the statute. We had a discussion with Mr. Salim about mere triggering events. I don't think that you can look at 402 in the Clean Water Act, which was an issue in the Home Builders case, and say that if you work through all the provisions in B1 through 9, that they're all just triggering events. They're all things that involve lots of discretion when you look at how they cross-reference the statute. That's also relevant to the A8 point. Let me leave you, I guess, with this last point, which is that the Andrus case from this court is also very relevant. That was a case where the group tried to bolt on NEPA analysis to ESA analysis, and the court rejected that. The court noted that the fact that you're dealing with an environmental statute is really irrelevant. You're dealing with something where that's already a factor that's been considered, and that's what the Andrus case says. Of course, in Home Builders, you're dealing with an environmental statute, too. You're dealing with the Clean Water Act itself in section 402. We think that the consistent interpretation of the agency in these past 20-plus years is something that's entitled to deference. The statute was reasonably construed, Your Honor, and we ask for the district court's decision to be judge the part. I hate to do this, but I was really hoping I could ask one last question. Oh, yeah, absolutely. Go ahead. Sorry. Mr. Clark, one last question. Is there anything for us to worry about in our use of language when we write this opinion, however it comes out? One thing that occurs to me is that if we use some sort of dichotomy between discretion and mechanics, that almost sounds like discretion and ministerial, and that makes me wonder if you were to approve a plan using these criteria that you call mechanical, should we give you abusive discretion review, arbitrary and capricious review, or would we do it de novo because it's just mechanical and we could mandamus you? I mean, is there something we should be worried about here? So, Judge Clark, there are kind of two parts to that. I'll take the second one first, which is Mr. Saleem had the opportunity here to review this actual plan and whether it comported with the statutory requirements, and for the most part, the district judge held that they did. He wanted a discursive explanation, essentially, of why the plan should be approved, and it was commanded for that basis. So, it does take place under arbitrary capricious review, but in terms of the first part of your question about mechanical versus discretionary, you know, I think I was trying to use that as a shorthand, but maybe the better sort of language to use would be to talk about relevant discretion statute. The statute here is focused on doing an analysis about providing resources. That's the ex-ante analysis. Mr. Saleem is incorrect when he says, basically, that Congress wanted a plan that could be, you know, press a button and execute, but that's just not the way it works in the real world. And so, if you look at these criteria from that perspective, you see they're all about setting up the federal on-scene coordinator when the accident actually happens to step in and say, hey, I've decided I'm going to need some in-situ burning. We have the burning chemical. I'm going to do, I need Okay. Yeah, I think I've got it, and I don't want to let you go too long in fairness to Mr. Saleem. Thank you, Mr. Clark. Counsel, Judge Merritt, did you have any other questions? I'm sorry. No. Counsel, I want to thank you for a number of things. One, for your excellent briefing. I think the briefing in this case was really great on all sides. I enjoyed the pictures for what it's That was my student's idea, your honor. Well, I enjoyed them. It's nice when you read briefs all the time to get a break from just words, and it was illustrative. Second, I want to thank you all for doing this via Zoom. I think you all are guinea pigs. This may be the first time the Sixth Circuit has ever done an argument via Zoom, and so I want to thank you for that. I know it's not ideal, but it seemed to be better than a phone argument. In that regard, I'd like you all, if you have time, to get in touch with Ms. Mitchell and just let her know what you thought and how we can do this better, or if there's any problems with it going forward, because it could be potentially that we're doing this a little more often in the near future at the very least. And so we would love your feedback. And finally, I want to thank you for the excellent arguments that you all made on behalf of the entire panel. We really appreciate your diligence and thoughtfulness in this case and the excellence that you brought to it, even under trying circumstances. So thank you very much. We will get an opinion out to you, and Ms. Mitchell, you may recess court. This honorable court is now adjourned.